IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-01797-CNS-TPO

ANGEL SAN ROMAN and
CARLOS LOPEZ,

  Plaintiffs,

v.

MINDY NACE, individually,
KYLE BENDZSA, individually,
KEVIN PARK, individually and
CITY OF FORT COLLINS, a municipality,

  Defendants.

---

**ORDER**

---

  Before the Court is Defendants' fully briefed Motion for Summary Judgment on All Claims Pursuant to Fed. R. Civ. P. 56 and Individual Defendants' Request for Qualified Immunity. ECF Nos. 61, 65, 70. For the reasons explained below, Defendants' motion, ECF No. 61, is GRANTED IN PART and DENIED IN PART.

## I.  BACKGROUND[1]

  In the late hours of July 16, 2021, a Fort Collins Police Services (FCPS) officer, non-party Kevin Alexander, received a report that a vehicle in the downtown area of the City of Fort Collins (the City) had been broken into and firearms were stolen. ECF No. 61

---

[1] The background section includes undisputed material facts drawn from the parties' briefing and attendant evidentiary submissions, including the body-worn camera (BWC) videos and other evidence.

1

at 2 ¶¶ 1, 2; ECF No. 65 at 1 ¶¶ 1, 2. The reporting party told Officer Alexander he had observed a suspicious SUV near his vehicle. ECF No. 61 at 2 ¶ 4; ECF No. 65 at 2 ¶ 4. Around the same time, a 911 call was made to report a "suspicious circumstance" approximately one to two blocks from where Officer Alexander was investigating the theft. ECF No. 61 at 3 ¶ 5; ECF No. 65 at 2 ¶ 5. The 911 caller also reported hearing a shotgun "being pumped" or "racked" in downtown Fort Collins, and FCPS dispatch reported the call to FCPS officers at 12:23 a.m. on July 17, 2021. ECF No. 61 at 3 ¶ 5; ECF No. 65 at 2 ¶ 5. Information from the 911 call and information gathered by Officer Alexander were relayed to Defendant Sargeant Kyle Bendzsa who "believed the two incidents were related." ECF No. 61 at 3 ¶ 7; ECF No. 65 at 2 ¶ 7. Bendzsa also "heard the sound of someone 'racking' a pump action shotgun" and observed Plaintiffs "standing near a sport utility vehicle . . . two blocks from where the weapons were reported stolen." ECF No. 61 at 3 ¶ 7; ECF No. 65 at 2 ¶ 7. After Bendzsa advised FCPS dispatch that he had a visual on the suspects' vehicle, additional FCPS officers arrived. ECF No. 61 at 4 ¶¶ 9–11; ECF No. 65 at 2 ¶¶ 9–11.

Bendzsa, Defendant Corporal Mindy Nace, and FCPS Officers Treutler and Donovan approached Plaintiffs Angel San Roman and Carlos Lopez and ordered them to "stop" and get on the ground. ECF No. 61 at 4 ¶ 12; ECF No. 65 at 2 ¶ 12; Ex. J (Bendzsa BWC) at 00:35–1:05; Ex. I (Treutler BWC) at 00:30–00:37.[2] Although San

---

[2] In connection with their motion, Defendants include conventionally submitted material, including video footage from Treutler's BWC (Exhibit I), Bendzsa's BWC (Exhibit J), and Park's BWC (Exhibit L). *See* ECF Nos. 62, 63. As Defendants did not file slipsheets for these exhibits, the Court cites these videos using the same exhibit names referenced in Defendants' motion. Plaintiffs also submitted exhibits of the BWC footage. *See* ECF Nos. 65-1 (slipsheet for Bendzsa BWC footage), 65-6 (slipsheet for Treutler's BWC footage), and 65-14 (slipsheet for Park BWC footage).

Roman stopped walking shortly thereafter, Ex. I at 00:30–00:41, Lopez continued walking away, *id.* at 00:30–00:45; *see also* ECF No. 61 at 4 ¶ 13; ECF No. 65 at 3 ¶ 13. The Court describes the events preceding Defendants' use of force on each Plaintiff below.

As to San Roman, the BWC footage shows that FCPS officers approached and gave San Roman several commands that he failed to follow, including instructions to get on the ground. *See* Ex. I at 0:30–2:00. Rather than comply, San Roman yelled at the officers to not "touch his sh*t" as they looked into a black SUV, stating he did not give them permission to do so. *Id.* at 1:08–1:28. He also raised his voice, insulted the FCPS officers, and repeatedly asked them to explain why he was being stopped. *See id.* at 1:30-1:38 (San Roman asking, in response to being told to get down on his knees, "why? What law have I broken? Tell me you stupid motherf**ckers, what law have a I broken?"). In response to his questions, the most any FCPS officer said was, "you're under investigation. We're detaining you." *Id.* at 1:40-1:45. At one point, San Roman tells police, "you come closer to me . . . there's going to be a f*cking problem." *Id.* at 1:00–1:05.[3]

After interacting with the officers from a distance for approximately 30 seconds, San Roman tossed his phone on the grass next to him, raised his hands in the air, and said, "I don't have nothing." *Id.* at 0:50–55. He then removed his t-shirt and said, "look, I don't have no weapons;" at the same time, the officers continued giving San Roman verbal commands with which he did not comply. *Id.* at 1:15–1:20. Shortly thereafter,

---

[3] Although audio from the BWC footage is not entirely clear at this point, at the very least, the Court is confident that San Roman can be heard saying, "you come closer to me" and "there's going to be a fucking problem." Ex. I at 1:00–1:05.

Bendzsa tapped Nace on the arm and told her to "Taser up" twice. Ex. J at 1:35–1:45; ECF No. 61 at 6 ¶ 22; ECF No. 65 at 5 ¶ 22.

San Roman then removed his undershirt and repeated, "I have no weapon. I have no weapon," while turning in a circle and asking, "do you see a weapon?" *Id.* at 1:44–1:55. Around the same time, Bendzsa directed Nace to "give [San Roman] a use of force warning," and Nace did so, telling San Roman that if he did not comply, force would be used against him. *Id.* at 1:44–1:59. Rather than comply, San Roman continued asking the officers, "do you see a weapon?" *Id.* at 1:44–1:55.

Bendzsa then instructed the officers "to press on," and he and three FCPS officers (including Nace) moved toward San Roman. *Id.* at 1:59–2:07. At the same time, San Roman pulled down his jeans, as well as what appear to be a pair of gym shorts, leaving him only in his underwear, with his pants and shorts around his ankles and his hands up. *Id.* at 1:55–2:05; Ex. J at 2:07. Approximately two seconds later, when officers were a few feet away, Nace utilized her Taser on San Roman, causing him to fall backward and hit his head on the sidewalk. *Id.* at 2:00–2:05. The officers approached San Roman after he fell, turned him over, and handcuffed him before calling for medical help. Ex. J at 2:12–4:00. At no point during the roughly 90 second interaction before Nace utilized her Taster did San Roman hide his hands, possess a weapon, make any threatening or hostile movements toward police, or attempt to flee.

As to Lopez, shortly after police began engaging with San Roman, Bendzsa requested that an FCPS officer to go "the next guy down," meaning an officer should engage with Lopez, Ex. J at 1:35–1:30; ECF No. 61 at 5 ¶ 16; ECF No. 65 at 4 ¶ 16, who

4

had continued walking at a normal pace in the same direction he was previously headed without stopping in response to the FCPS officers' initial commands, *id.* at 00:30–00:45; *see also* ECF No. 61 at 4 ¶ 13; ECF No. 65 at 3 ¶ 13.

Defendant Kevin Park appears to be the first FCPS officer to directly engage with Lopez, who was some distance away from where other officers were interacting with San Roman. *See* Ex. L (Park BWC). After exiting his car, Park approached Lopez until there was approximately three feet between them. *Id.* at 00:35–00:30.[4] Park then told Lopez, "you're under arrest," to which Lopez responded by asking twice, "over what?" *Id.* at 00:30–00:38. Park did not respond to Lopez's questions, saying instead, "set your phone down or force will be used against you. I'm not going to tell you again." *Id.* at 00:32–38. At the same time, Lopez, with his right hand empty and in the air and his left hand holding his phone with the camera pointed toward Park said, "hold on. hold on." *Id.* 00:37–00:40. Park repeated, "I'm not gonna tell you again. Set your phone down," to which Lopez responded, "hold on. I have a right to record," *id.* at 00:40–00:47.

At that point, Park, still no more than three feet away or so from Lopez, extended his arm and sprayed pepper spray in Lopez's face.[5] *Id.* at 00:45–50. With Lopez still holding his phone in one hand and covering his face with another, Park again told Lopez to set his phone down because he was under arrest. *Id.* at 00:45–00:55. While Lopez held his face and groaned, Park grabbed the phone out of Lopez's hand. *Id.* Park and other

---

[4] Although the BWC footage shows Park walking toward Lopez at 00:23, the audio does not appear to have been turned on until 00:31 into the recording. *See* Ex. L at 00:23–00:32. As a result, the Court cannot determine whether Park or Lopez said anything else to the other as Park initially approached.

[5] Defendants also refer to pepper spray as "Oleoresin Capsicum" or "O.C. spray." ECF No. 65 at 11 ¶ 53.

FCPS officers now at the scene grabbed Lopez and placed him in handcuffs on the ground. *Id.* at 00:55–1:20. At no point during the encounter did Lopez possess a weapon, verbally threaten, or make any threatening movement toward Park or any FCPS officer.

After their encounter with Defendants Nace, Bendzsa, and Park (the Individual Defendants),[6] Plaintiffs were arrested for violating C.R.S. § 18-4-502 (First Degree Criminal Trespass to a vehicle) and C.R.S. § 18-4-401(2)(g) (Theft from a Vehicle), both of which are fifth degree felonies. ECF No. 61 at 19 ¶¶ 94–95; ECF No. 65 at 17.

## II.    LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is genuinely disputed "if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted). To defeat a properly supported summary judgment motion, the nonmoving party "may not rest upon the mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986) (alteration and quotation marks omitted). The Court thus determines whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. At this stage,

---

[6] Each Individual Defendant was a police officer working for FCPS at the time. ECF No. 61 at 2 ("[O]n July 17, 2021, [] the individual Defendants [] were City of Fort Collins Police Officers.").

the Court draws reasonable inferences and construes the factual record in the light most favorable to the nonmoving party. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

### III.    ANALYSIS

Plaintiffs bring claims against the Individual Defendants and Defendant City of Fort Collins pursuant to 42 U.S.C. § 1983. ECF No. 1. Claim I is asserted by both Plaintiffs against all Defendants for excessive force in violation of the Fourth Amendment. Claim II is asserted by Lopez against Park for retaliation in violation of Lopez's First Amendment rights. Defendants' summary judgment motion seeks dismissal of all claims. ECF No. 61.

The Court considers Defendants' arguments and Plaintiffs' response as to each count below. As explained, Defendants' motion is GRANTED IN PART as to Claim I against Defendant Park and Defendant City of Fort Collins, and DENIED IN PART as to Plaintiffs' remaining claims.

### A.  Qualified Immunity

The Individual Defendants contend they are each entitled to qualified immunity on the excessive force claims because Plaintiffs cannot establish any constitutional violations of clearly established law.[7] *See* ECF No. 61 at 27–28.

The doctrine of qualified immunity generally shields "government officials performing discretionary functions. . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)

---

[7] Notably, the motion does not argue that Park is entitled to qualified immunity as to Lopez's claim for First Amendment retaliation. *See* ECF No. 61 at 27–28 (asserting that the Individual Defendants are entitled to qualified immunity and incorporating by reference only the arguments made in connection with the excessive force claims).

(citation omitted). To defeat an assertion of qualified immunity, "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotations omitted). To assess whether this burden is met, the Court "determine[s] which facts a jury could reasonably find from the evidence presented," *Est. of George v. City of Rifle, Colorado*, 85 F.4th 1300, 1313 (10th Cir. 2023) (quoting *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010)), and assesses whether "plaintiff's version of the facts . . . find[s] support in the record," *Thomson v. Salt Lake County,* 584 F.3d 1304, 1312 (10th Cir. 2009) (internal citations omitted). In doing so, the Court "construe[s] the facts in the light most favorable to the plaintiff as the nonmoving party." *Burns v. Holcombe*, No. 09-CV-152-JHP, 2010 WL 2756954, at *8 (E.D. Okla. July 12, 2010) (citing *Scott v. Harris,* 550 U.S. 372, 378, 380 (2007)). The Court has discretion to begin the qualified immunity analysis with either prong—both of which must be satisfied to avoid dismissal. *See Hemry v. Ross*, 62 F.4th 1248, 1253 (10th Cir. 2023) ("If the plaintiff fails to satisfy either prong of qualified immunity, his suit fails. Accordingly, we have 'discretion to decide the order in which these two prongs should be addressed,' and need not address both.").

If Plaintiff meets their two-part burden as to Defendants' assertion of qualified immunity and "demonstrates that the official violated a clearly established constitutional or statutory right, then the burden shifts back to the defendant, who must prove that 'no genuine issues of material fact' exist and that the defendant 'is entitled to judgment as a

8

matter of law.'" *Olsen v. Layton Hills Mall,* 312 F.3d 1304,1312 (10th Cir. 2002) (citing *Gross v. Pirtle,* 245 F.3d 1151, 1156 (10th Cir. 2001)). If "the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be 'properly denied.'" *Id.* at 1312 (citing *Salmon v. Schwarz,* 948 F.2d 1131, 1136 (10th Cir. 1991)).

### 1.    *Defendant Nace*

Nace asserts that she is entitled to qualified immunity as to San Roman's claim for excessive force arising from her use of a Taser on him. Explained below, she is not.

### a.  *Violation of a Constitutional Right*

To analyze an excessive force claim under § 1983, the Court "begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citation omitted). "Where, as here, the excessive force claim arises in the context of an arrest[,] . . . it is most properly characterized as one invoking the protections of the Fourth Amendment." *Id.*; *accord Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Notably, "[t]he Fourth Amendment 'does not require police to use the least intrusive means in the course of a detention, only reasonable ones.'" *Lindsey v. Hyler*, 918 F.3d 1109, 1113–14 (10th Cir. 2019) (citing *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009)).

To establish a constitutional violation, Plaintiffs "must demonstrate the force used was objectively unreasonable." *Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 759 (10th Cir. 2021) (quoting *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008)). This requires "balanc[ing] the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the countervailing governmental interests at stake," *Andersen v. DelCore*, 79 F.4th 1153, 1163 (10th Cir. 2023) (quoting *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010) (internal quotation marks omitted)), while "'allow[ing] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation,'" *id.* (quoting *Graham*, 490 U.S. at 396–97). The inquiry into "the reasonableness of 'a particular use of force'" looks at "'the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,'" *id.* (quoting *Graham*, 490 U.S. at 396), and "depends not only on *when*" force was used, "but also on *how* it is carried out," *Graham*, 490 U.S. at 395 (emphasis in original).

In assessing reasonableness, courts consider three nonexclusive factors set forth by the Supreme Court in *Graham v. Connor*, including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. This requires looking "at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1169 (10th Cir. 2021) (quoting *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020)). But as "[t]he *Graham* factors are nonexclusive and not dispositive," courts must consider "the totality of the circumstances." *Palacios v. Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023).

Below, the Court considers these factors in connection with San Roman's excessive force claim against Nace.

***Severity of the Crime at Issue.*** The first *Graham* factor considers the severity of the crime at issue, which "weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent." *Vette*, 989 F.3d at 1170 (collecting cases). Because it is undisputed that at the time of the encounter, Plaintiffs were suspected of committing two fifth degree felonies, ECF No. 61 at 19 ¶¶ 94, 95; ECF No. 65 at 17 ¶¶ 94, 95, this factor weighs in Nace's favor. *See, e.g., Vette*, 989 F.3d at 1170 (first *Graham* factor weighs in officer's favor if suspect is accused of a felony, even if it is "a nonviolent crime").

***Immediacy of the Threat.*** "The second factor—the immediacy of a threat to safety—is 'undoubtedly the most important and fact intensive.'" *Est. of Harmon v. Salt Lake City*, 134 F.4th 1119, 1122 (10th Cir. 2025) (citing *Arnold v. City of Olathe*, 35 F.4th 778, 789 (10th Cir. 2022) (cleaned up)). In assessing this factor, courts consider factors that include but are not limited to "'(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.'" *Thomson*, 584 F.3d at 1314–15 (citing *Estate of Larsen,* 511 F.3d at 1260). Courts must also consider "whether [Defendants] were in danger at the precise moment that they used force.'" *Vette*, 989 F.3d at 1170 (citing *Emmett*, 973 F.3d at 1136). While "the 'totality of the circumstances' inquiry into a use of force has no time limit," and "earlier facts and

11

circumstances may bear on how a reasonable officer would have understood and responded to later ones," "the situation at the precise time" force was used "will often be what matters most." *Barnes v. Felix*, 605 U.S. 73, 80 (2025); *id.* ("[I]t is . . . the officer's choice [to use force] in that moment that is under review.").

Defendants contend that the second *Graham* factor weighs in Nace's favor because prior to utilizing her Taser, (1) San Roman resisted multiple commands, including "multiple warnings to comply about using a Taser;" (2) San Roman was "large, verbally aggressive, and unpredictable;" and (3) "the totality of the circumstances presented a justifiable threat suggesting the existence of weapons." ECF No. 61 at 22–23, 25. Plaintiffs dispute not only this recitation of the facts but also the inferences Defendants ask the Court to draw. Plaintiffs argue instead that this factor weighs in San Roman's favor because he "plainly did not pose an immediate threat to anyone at the moment when Nace made the decision to taser him" given that "[h]e was standing with his hands open in the air above him, shirtless, and with his pants around his ankles." ECF No. 65 at 18. As explained below, the Court agrees with Plaintiffs.

Aside from stopping shortly after officers commanded him to do so, San Roman was given several other commands (including ordering to get on the ground and turn around) with which he failed to comply before Nace utilized her Taser. *Id.* at 0:30–2:00. San Roman also repeatedly asked the officers why he was being stopped rather than comply with their orders. *See, e.g.*, *id.* at 1:30-1:38 (asking, in response to being told to get down on his knees, "why? What law have I broken? Tell me you stupid motherf**ckers, what law have a I broken?"). Though refusing to follow orders can justify the "use of some

force," *Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016), other of San Roman's behaviors show he undertook extensive efforts to demonstrate that he was not armed or a threat to the officers such that any use of force should have been limited. While Defendants attempt to cast San Roman's behavior as "erratic" and indicative of a threat, ECF No. 61 at 23, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that San Roman's actions were anything but. Images from Officer Treutler's BWC footage make this clear.[8]

Not long after San Roman began interacting with officers, he tossed his phone on the grass beside him, raised his arms, and said, "I don't have nothing.":



Ex. I at 0:50–55. Around 20 seconds later, San Roman removed his t-shirt and told police, "I don't have no weapons.":

---

[8] San Roman's interaction with officers begins approximately 30 seconds into Officer Treutler's BWC video. *See* Ex. I at 00:30.



*Id.* at 1:15–1:20. After another 25 seconds elapsed, San Roman removed his undershirt and told the officers, twice, that he did not have a weapon before turning in a circle and asking, "do you see a weapon?":

 

*Id.* at 1:44–1:55. Despite clearly demonstrating that he had no weapons on him, FCPS officers moved toward San Roman with their weapons drawn. At the same time, San Roman pulled down his jeans and gym shorts, leaving him only in his underwear, with his pants and shorts around his ankles and his arms in the air:

 

*Id.* at 1:55–2:02; Ex. J at 2:07. Less than two seconds later, Defendant Nace utilized her Taser on him. *Id.* at 1:59–2:05. As San Roman was undressed at that point, "it should have been apparent that he was unarmed." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

Though San Roman did not follow officers' commands, a reasonable jury could find that at no point during the almost minute and a half before Nace tased him did he make any threatening or hostile movements or advance toward police. Nor did he lower his arms or conceal his hands, and he was not within the officers' reach such that he was a threat while unarmed. *See, e.g.*, *Hernandez v. Larson*, No. 21-cv-01538-PAB-MEH, 2023 WL 6127879, at *12 (D. Colo. Sept. 19, 2023) (second *Graham* favored plaintiff who raised his hands in the air and never advanced towards or pushed the officers).

That San Roman cursed at the officers and questioned the basis for their stop does not negate that he took undertook extensive efforts to show that he was unarmed—a fact that matters significantly when assessing the immediacy of the threat. *See, e.g.*, *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (though plaintiff was a "large man" who

15

asked a "potentially confrontational question" that "might present some threat" during his police interaction, the second *Graham* factor weighed "heavily" in his favor because plaintiff had "no weapon, made no overt threats, and did not get within reach" of anyone to harm them); *Bryan*, 630 F.3d at 826–27 (suspect "in tennis shoes and boxer shorts" who made it "apparent that he was unarmed" was not an immediate threat despite "shouting . . . expletives" from a fifteen to twenty foot distance while stationary); *Sexton v. Somersalmi*, --- F.Supp.3d ----, No. 23-cv-00555-GPG-STV, 2026 WL 1251591, at *5 (D. Colo. May 5, 2026) (second *Graham* factor weighed in plaintiff's favor even though he yelled and cursed at police prior to his arrest because "the record could be reasonably interpreted to show that there is no threat whatsoever to officer safety").

Finally, it is worth noting that the parties dispute whether San Roman verbally threatened the officers prior to being tased. At one point during the encounter, San Roman tells police, "you come closer to me . . . there's going to be a fucking problem," Ex. I at 1:00–1:05—a statement Defendants contend was a threat that San Roman "would fight with Officers if approached." ECF No. 61 at 5 ¶ 18, 10 ¶ 46, 14 ¶ 70; *see also id.* at 21. Regardless of what he meant by this, it is undisputed that *Nace never actually heard San Roman threaten the officers*. *Id.* at 18 ¶ 89; ECF No. 65 at 16 ¶ 89; *see also* ECF No. 65-7 (Nace Dep. Tr.) at 66:16–18 ("Q. . . . Did you ever hear [San Roman] threaten the police? A. No I don't believe so.").[9] This is significant as "the perception of danger that

---

[9] In the motion, Defendants contend that "[a]lthough Officer Nace did not hear the threat, it was still acceptable for San Roman to be tased because weapons and guns were reported to be involved; there was a lack of cooperation, and; they were in a highly populated area." ECF No. 61 at 18 ¶ 89. But as discussed, since San Roman clearly showed he had no weapons on him, the Court is unpersuaded by this.

reasonable officers in [Nace's] position would have had at the precise moment that lethal force was used" is relevant to assessing the immediacy of the threat here, *Est. of Taylor*, 16 F.4th at 771; *see also Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene.") (citation omitted), and a reasonable jury could find that Nace did not perceive a serious threat given that San Roman was unarmed and she did not hear him make a verbal threat.

In sum, the Court finds that the second *Graham* factor heavily favors San Roman.

***Resisting or Evading Arrest.*** "The final *Graham* factor asks whether the suspect was actively resisting arrest or fleeing." *Emmett*, 973 F.3d at 1136. Given the totality of the circumstances, the Court finds this factor is neutral and weighs in favor of neither party.

Though San Roman did not immediately stop when ordered, he did so shortly after. Ex. I at 00:30–00:38.[10] His brief noncompliance notwithstanding, San Roman made no attempt to flee; he remained in the same spot facing officers with his hands visible for the entire encounter. *Id.* at 00:30–2:00. And by pulling his jeans and shorts down to his ankles, San Roman "made himself easier to capture, not harder." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1282 (10th Cir. 2007) (suspect did not flee when he "made himself easier to capture, not harder"); *Cavanaugh*, 625 F.3d at 665–66 (plaintiff "was not

---

[10] Viewing that fact in the light most favorable to Plaintiff, a reasonable jury could construe San Roman's behavior not as an effort to flee or evade arrest, but rather that he ignored these commands out of fear or confusion as to why he was being approached at all. *See* ECF No. 65 at 2–3 ¶ 12. Moreover, even if this fact "weighs in favor of the use of *some* force during the period in which [San Roman] was resisting[,] . . . the relevant inquiry is whether the taser use was reasonable and *proportionate given [San Roman's] resistance*." *Perea*, 817 F.3d at 1203 (citing *Cortez,* 478 F.3d at 1126 (emphasis added)). In this case, the Court concludes it was not.

fleeing—she was quickly walking towards her own home, where [the officer] could easily arrest her if he so desired") (citations omitted).

It is undisputed, however, that San Roman did refuse other commands, including multiple orders to "turn around" and "get on the ground," Ex. I at 00:35–2:00. For their part, the Individual Defendants argue that by resisting lawful commands, including Nace's "multiple use of force warnings," the third factor weighs firmly in her favor. ECF No. 61 at 23; ECF No. 70 at 9–10. By contrast, Plaintiffs argue that San Roman's noncompliance was "passive resistance at most." ECF No. 65 at 20–21. Though Defendants do not acknowledge the distinction between passive and active resistance, other cases establish that the third *Graham* factor weighs less heavily in an officer's favor where a suspect's resistance is passive. *See, e.g.*, *Coronado v. Olsen*, No. 2:18-CV-83, 2019 WL 652350, at *6 (D. Utah Feb. 15, 2019) ("[F]orce can only be applied to a suspect who is actively resisting arrest, and that force cannot be excessive.") (citing *Perea*, 817 F.3d at 1204).

San Roman's passive resistance here is comparable to that in *Davis v. Clifford*, where the Tenth Circuit concluded that the third *Graham* factor weighed "slightly against" officers because plaintiff was "not actively resisting arrest or attempting to flee" even though she "rolled up her window, left her keys in the ignition, and refused to exit the vehicle when ordered" because "police cars surrounded [her] car on all sides [and] she could not have driven away." 825 F.3d 1131, 1136 (10th Cir. 2016). There, the Tenth Circuit reasoned that since "there [was] no evidence that [plaintiff] actually attempted to flee," she could not be considered "'*actively resisting* arrest or attempting to flee' just

18

because 'she did not immediately obey the officers' orders.'" *Id.* at 1135–36 (emphasis added). The same is true here.

In sum, aside from a brief period of noncompliance, there is no evidence showing that San Roman actively resisted arrest or attempted to flee at any point.[11] *Cavanaugh*, 625 F.3d at 665; *Davis*, 825 F.3d at 1136 ("no evidence that [plaintiff] actually attempted to flee" despite refusing to follow commands). Accordingly, the Court thus concludes that the third *Graham* factor is neutral and weighs in favor of neither party. *See, e.g.*, *Davis*, 825 F.3d at 1136 (third *Graham* factor weighed "slightly against" officer defendants because plaintiff "could not be considered '*actively resisting* arrest or attempting to flee' just because 'she did not immediately obey the officers' orders'") (citation omitted); *Sauceda v. Dailey*, No. 97-2278-JWL, 1998 WL 422811, at *8 (D. Kan. June 12, 1998) (third *Graham* factor weighs "against the use of force because plaintiff was physically passive or defensive during the entire encounter"); *but see Sexton*, 2026 WL 1251591, at *6 (third *Graham* factor "weighs slightly in favor of [officers]" where plaintiff did eventually comply with commands to get out of his vehicle, but "showed no intention of leaving or allowing himself to be taken into custody unless he was forced to do so").

---

[11] It is not clear from the BWC footage that San Roman even knew he was going to be arrested such that it was possible for him to actively resist. During his minute and a half encounter with police, *see* Ex. I at 00:30–2:01, San Roman repeatedly asked officers what he did wrong, *id.* at 1:30–1:40, and in response, the most officers said was that San Roman was being investigated, *id.* 1:40-1:45 ("You're under investigation. We're detaining you."). Viewing the facts in a light most favorable to San Roman as the nonmoving party, a reasonable jury could find that he "had no reason to suspect that [he] was under arrest until after [he] was Tasered"—a fact the Tenth Circuit has found persuasive when assessing the third *Graham* factor. *See Cavanaugh*, 625 F.3d at 665.

***Additional considerations***. The *Graham* factors notwithstanding, determining whether an officer used unconstitutionally excessive force requires considering the "totality of the circumstances" of the specific interaction. *Graham*, 490 U.S. at 396 (citing *Garner,* 471 U.S. at 8–9). Here, the Court considers two additional factors, both of which weigh in San Roman's favor.

*First*, it is notable that the force used by Nace was a Taser—"a weapon that sends up to 50,000 volts of electricity through a person's body, causing temporary paralysis and excruciating pain" and seizes a suspect "in an abrupt and violent manner." *Cavanaugh*, 625 F.3d at 665. As the Tenth Circuit has explained, "the use of a taser . . . amounts to a significant physical intrusion requiring a correspondingly significant justification," *Wilson v. City of Lafayette*, 510 F. App'x 775, 778 (10th Cir. 2013), and "[u]nder prevailing Tenth Circuit authority, 'it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance,'" *Est. of Booker v. Gomez*, 745 F.3d 405, 424 (10th Cir. 2014) (quoting *Casey*, 509 F.3d at 1286). Considering the significant force emitted and the likelihood that it could cause substantial harm, the justification for its use (either the risk of flight or a threat to safety) must be significant to be reasonable. *See Wilson*, 510 Fed.App'x at 778 (When "the nature and quality of the intrusion" is significant, it requires a "heightened showing of countervailing governmental interests to justify the intrusion.") (citing *Graham*, 490 U.S. at 396); *Cavanaugh*, 625 F.3d at 665 (the "abrupt and violent" nature of the force from a Taser constitutes a "quite severe" intrusion of a suspect's Fourth Amendment rights). In this case, considering San Roman's (at most) passive resistance and extensive

20

efforts to demonstrate that he was unarmed, the Court is not convinced that such a severe intrusion was justified.

*Second*, Defendants contend that the totality of the circumstances analysis requires considering that FCPS officers were responding to a 911 call about stolen weapons and that someone was heard "racking a shotgun" in the same area where officers encountered Plaintiffs. ECF No. 70 at 6–7. Defendants further contend that Plaintiffs attempt to "diminish the seriousness of someone racking a shotgun in a downtown area." *Id.* at 7. Although Defendants are correct that "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded," *Barnes*, 605 U.S. at 80, even considering them, it is beyond dispute that San Roman was unarmed when Nace used her Taser. Accordingly, the Court declines Defendants' invitation to put greater weight on the likelihood of a threat based on the earlier circumstances but ignore San Roman's clear attempts to show otherwise. *See Emmett*, 973 F.3d at 1135 (An excessive force claim looks "at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment.") (citing *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004)).

Considering the totality of the circumstances, including that the first *Graham* factors weigh in Nace's favor,[12] the third *Graham* factor is neutral, and the second and undoubtedly "most important" *Graham* factor, *see Est. of Harmon*, 134 F.4th at 1122 (citation omitted), weighs strongly in San Roman's favor, a reasonable jury could

---

[12] Though, as explained, the third *Graham* factor weighs only slightly in Nace's favor.

conclude that it was objectively unreasonable and in violation of San Roman's constitutional rights for Nace to use a Taser on San Roman. *See, e.g.*, *Perea*, 817 F.3d at 1204 (use of Taser was "objectively unreasonable," including because officers tasered the suspect without "explaining what they were doing or why" even though the suspect "posed no threat").

### b. Clearly Established

The second prong of the qualified immunity analysis asks whether Nace's conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818. Explained below, the Court finds that San Roman's rights were clearly established.

To survive dismissal, San Roman must demonstrate that the right he asserts was "clearly established" and "particularized" to the facts of the case at the time of the encounter. *White v. Pauly*, 580 U.S. 73, 79 (2017) (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). "[F]or a right to be 'particularized,' there must ordinarily be a Supreme Court or Tenth Circuit decision on point, or 'clearly established weight of authority' from other courts." *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995) (citing *Medina v. City & County of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992)); *see also Tachias v. Sanders*, 130 F.4th 836, 844 (10th Cir. 2025) (courts assess whether past cases "closely fit the facts of the present case" to determine if the "conduct, at the time, violated clearly established law"). While courts should be careful "not to define clearly established law at too high a level of generality," *Stepp v. Lockhart*, 168 F.4th 1286, 1301 (10th Cir. 2026) (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021)), "'general statements of the

law' can suffice to clearly establish a right if they 'give fair and clear warning' that the particular conduct at issue is unconstitutional," *Wilson v. Stoltenberg*, --- F.4th ----, No. 25-3139, 2026 WL 2066343, at *5 (10th Cir. July 17, 2026) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (cleaned up)). At bottom, "'[t]he salient question is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged conduct was unconstitutional.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Hope*, 536 U.S. at 741 (cleaned up)).

Defendants contend there is no clearly established law "where an officer was found to have violated a plaintiff's constitutional rights . . . for the application of a taser" on a person "reasonably suspected of committing felonies involving firearms and repeated refusal to submit to lawful commands." ECF No. 61 at 28. Plaintiffs disagree and argue that because San Roman "did not present an immediate threat," clearly established law holds that Nace's use of a Taser was unconstitutional. ECF No. 65 at 23 (citing, *e.g.*, *Emmett*, 973 F.3d 1127). The Court agrees with Plaintiffs.

It is well settled in the Tenth Circuit that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance." *Casey*, 509 F.3d at 1286. That this prohibition is described in a somewhat general manner does not preclude finding that the law is clearly established because there can be no doubt that it "appl[ies] with obvious clarity to the specific conduct in question" here. *Ashaheed v. Currington*, 7 F.4th 1236, 1247 (10th Cir. 2021) (citation omitted). Indeed, the Tenth Circuit's statement in *Casey* was sufficient to provide Nace with a "'fair and clear warning'" that using her Taser on San Roman was

permissible only if a lesser amount of force would not do. *Wilson*, 2026 WL 2066343, at *5 ("Fair and clear warning exists when 'a general rule states the contours of a constitutional transgression in a well-defined or well-marked manner without leaving a vaguely-defined legal border.'") (citing *Ashaheed*, 7 F.4th at 1246 (cleaned up)).

Although verbal commands were attempted unsuccessfully here, there is no evidence showing that Nace considered (much less actually used) any other less forceful method to secure San Roman's arrest before using her Taser.[13] Nor, as admitted in her deposition, did she make any meaningful attempt to deescalate the situation or respond to San Roman's inquiries,[14] even though San Roman was outnumbered by FCPS officers, demonstrated that he was unarmed, did not actively resist arrest, and made himself less able to fight back or run by pulling his pants to his ankles as officers approached. *See, e.g.*, *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 341 (5th Cir. 2020) (defendant officers "violated clearly established law by failing to attempt less forceful alternatives and by continuing to inflict force" via a Taser and other physical violence despite plaintiff "posing no threat, and giving no active resistance"); *cf. Wilson*, 510 F. App'x at 778 (no clearly established law prohibiting the use of a Taser where "there

---

[13] Of course, police officers routinely arrest verbally non-compliant suspects by attempting to physically restrain them before resorting to the use of more significant force if the suspect's non-compliance continues. *Cf., e.g.*, *Krueger v. Phillips*, 154 F.4th 1164, 1199–1200 (10th Cir. 2025), *cert. denied sub nom. Craig v. Krueger*, 146 S. Ct. 1807 (2026), *and cert. denied sub nom. Crockett v. Krueger*, 146 S. Ct. 1832 (2026) (bringing suspect to the ground and using a Taser to subdue him after the suspect "began to struggle and kick" was not unreasonable until after the suspect was "subdued . . . and was no longer actively resisting").

[14] Nace testified that she made "one small attempt" to deescalate the situation with San Roman prior to using her Taser by "asking him his name." ECF No. 65-7 at 59:9–12 ("Q. Other than asking [San Roman] his name, did you or anyone else do anything to try to deescalate the situation? A. Not that I recall."). Viewing this fact in the light most favorable to San Roman, a reasonable juror could conclude that her questions were asked to gather information and not to deescalate the situation.

is no dispute [plaintiff] was fleeing" and "reaching for his pocket, especially after being warned not to do so," because those actions "could lead a reasonable officer to worry he might have a lethal weapon and was prepared to use it").

That the crime at issue here was a felony and not a misdemeanor does not make *Casey* less relevant because Plaintiffs are not required to cite a case with "identical facts" to demonstrate that the law is clearly established. *Kapinski v. City of Albuquerque*, 964 F.3d 900, 910 (10th Cir. 2020). And like the existing precedent in *Casey*, the undisputed evidence here demonstrates that when force was used, San Roman did not "present[] an immediate threat of death or serious injury to himself or others.'" *Casey*, 509 F.3d at 1286. And to the extent FCPS officers considered San Roman dangerous because the felonies of which he was suspected involved firearms, the Court has already concluded that by demonstrating he was unarmed, a reasonable jury could certainly conclude that San Roman presented only a minimal threat. Moreover, San Roman did not actively resist an arrest or fight the officers—factors the Tenth Circuit cited when concluding that the use of force in *Casey* was unreasonable. *See id.*[15]

There are also similarities between the circumstances here and those in *Emmett v. Armstrong*, another Tenth Circuit decision that found an officer's use of a Taser to be unreasonable. 973 F.3d at 1136. There, like here, the suspect initially engaged in "rather halfhearted" flight but eventually stopped and "had ceased any *active resistance*" when

---

[15] For example, the Tenth Circuit found that an officer's use of a taser was reasonable in *Hinton v. City of Elwood* because the *Hinton* suspect was kicking, biting, and shoving officers. 997 F.2d 774, 777 (10th Cir. 1993). As the Tenth Circuit later explained in *Casey*, what specifically "justified [the officer's] conduct" in *Hinton* was the suspect's "*active resistance* to arrest." *Casey*, 509 F.3d at 1286 (emphasis added). Considering this justification, San Roman's situation is far more like the one in *Casey* than in *Hinton*.

the Taser was used. *Id.* (emphasis added). Likewise, the suspect presented no safety threat when the Taser was used "and there were no allegations that any weapons were involved." *Id.* The same is true of San Roman.

In light of the above—including the Tenth Circuit's unambiguous statement that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force . . . could not exact compliance," *Casey*, 509 F.3d at 1286—the Court concludes that clearly established law existed at the time of San Roman's encounter with the FCPS officers. *See, e.g.*, *id.*; *Emmett*, 973 F.3d at 1138; *Perea*, 817 F.3d at 1204; *see also Coronado*, 2019 WL 652350, at *6 (explaining that *Perea* put officers "on notice that force [from a Taser] should not be used on a non-violent or non-threatening suspect unless that suspect is actively resisting arrest, and even then, the force used should be no more than is necessary to subdue.").

Accordingly, Nace's request for qualified immunity is denied.

### 2.    *Defendant Bendzsa*

The Court next considers whether Bendzsa is entitled to qualified immunity. Although Defendants argue that he is, ECF No. 61 at 27; ECF No. 70 at 14, they raise no specific arguments or evidence in support of that contention. To the extent Defendants incorporate by reference their arguments that there is no genuine dispute of material fact, ECF No. 61 at 27–28, these arguments do not address whether *Bendzsa* violated San Roman's constitutional rights. In fact, Defendants do not mention (let alone discuss) the *Graham* factors with respect to the claim against Bendzsa. *See* ECF No. 61 at 23–24. And as to the "clearly established" prong, Defendants argue there is no clearly established

26

law to show that the Individual Defendants violated Plaintiffs' constitutional rights "*in particular*, for the *application of a taser or OC spray* on individuals who were reasonably suspected of committing felonies involving firearms and repeated refusal to submit to lawful commands." *Id.* at 28 (emphasis added). But neither scenario addresses Bendzsa's actions in *directing* Nace "Taser up," and Defendants make no other argument as to this prong.

"[W]here a defendant makes only a bare assertion of qualified immunity," as Bendzsa does here, Plaintiffs "bear[] no burden to satisfy the ordinary two-prong test." *Berryman v. Niceta*, 143 F.4th 1134, 1140–41 (10th Cir. 2025). Accordingly, because Defendants fail to meaningfully support their argument as to Bendzsa, he is not entitled to qualified immunity. *See  Ellis v. Salt Lake City Corp.*, 147 F.4th 1206, 1220–21 (10th Cir. 2025) ("Because a 'defendant must raise the qualified immunity defense' at summary judgment to benefit from the shield it affords, the argument that a plaintiff fails to raise a genuine dispute of material fact as to whether her constitutional rights were violated, standing alone, falls short of explicitly raising a qualified immunity defense.") (citing *Woodward v. City of Worland*, 977 F.2d 1392, 1396 (10th Cir. 1992)).

### 3.     *Defendant Park*

The Court next considers whether Park is entitled to qualified immunity. As explained, because no clearly established law supports Lopez's excessive force claim, Park is entitled to qualified immunity on this claim. *See Hemry*, 62 F.4th at 1253.

### a. Constitutional Violation

As an initial matter, analyzing the totality of the circumstances requires noting that only 17 seconds elapsed between when Park first encountered Lopez and when he sprayed Lopez in the face with pepper spray at close range. Ex. L at 00:30–00:47. During that time, Lopez did not display a weapon, attempt to flee, make any threatening movements, conceal his hands, verbally threaten anyone, or even raise his voice. *Id.*

These facts are distinguishable from those in *Mecham v. Frazier*, where the Tenth Circuit found the use of pepper spray to be reasonable even though the suspect only verbally resisted an officer's commands. 500 F.3d 1200, 1204–06 (10th Cir. 2007). In *Mecham*, the Tenth Circuit concluded that the force used was reasonable because the suspect mislead officers about the validity of her license, ignored multiple of officers' warnings and commands, stayed in the driver's seat with keys to her car, refused numerous opportunities to comply, and turned "what should have been a routine [traffic] encounter turned into a fifty-minute ordeal requiring arrest." *Id.* In contrast, Lopez here calmly questioned Park's commands for *less than 30 seconds* before being pepper sprayed. *See* Ex. L at 00:30–00:47; *see also c.f.*, *Arnold v. City of Olathe, Kansas*, 35 F.4th 778, 794 (10th Cir. 2022) (distinguishing *Arnold* from cases where officers used unconstitutionally excessive force because *Arnold* involved "[e]xtensive negotiations and intervening events [that] occurred over the course of three hours, in contrast to the short timelines in the cases [plaintiff] cites"). The brevity of the encounter here, plus Park's refusal to answer Lopez's questions or engage in deescalation efforts, are considered in connection with the below.

28

***Severity of the Crime at Issue.*** As with San Roman's claim against Nace, the first *Graham* factor weighs in Park's favor here because Lopez was suspected of the same fifth degree felonies as San Roman at the time of the encounter. ECF No. 61 at 19 ¶¶ 94–95; ECF No. 65 at 17.

***Immediacy of the Threat.*** As to the immediacy of the threat Lopez posed, *see Est. of Taylor*, 16 F.4th at 771, Defendants contend that given the possible existence of weapons, "the totality of the circumstances presented a justifiable threat" such that the second *Graham* factor weighs in Park's favor. ECF No. 61 at 25. As support, Defendants note that Lopez resisted lawful commands, ignored multiple use of force warnings, and could have been concealing a weapon in his clothes.[16] *Id.* Plaintiffs disagree and argue that Lopez did not present an immediate threat, never threatened anyone, was never observed holding a firearm, and remained calm and polite throughout his brief encounter with Park. ECF No. 65 at 26. Plaintiffs are correct.

After Park approached him, Lopez stopped walking and remained calm during the 17 seconds before Park used his Taser. Ex. L at 00:30–00:47. Though Lopez asked Park questions in response to (rather than comply with) Park's commands, a reasonable jury could find that Lopez did so in a calm and respectful manner and made no hostile movements toward Park and did not try to get anything out of his pockets. *Id.* Considering

---

[16] The Court notes that even though this was a weapons call, Park never asked Lopez if he had any weapons on him before using the pepper spray—a fact that could lead a reasonable jury to conclude that Park did not assess Lopez to be an immediate threat, regardless of the crime he was suspected of committing. *Cf. United States v. Harris*, 313 F.3d 1228, 1236 (10th Cir. 2002) ("Officer Allen testified that he asked Defendant to take his hands out of his pockets because he was concerned that Defendant might be concealing a weapon in one of the pockets. When Defendant refused to remove his hands, Officer Allen was reasonably justified in believing that Defendant might be armed and dangerous.") (citation omitted).

"how a reasonable officer on the scene would have assessed the manifest indicators of [Plaintiff's] intentions—that is, [Plaintiff's] actions," "be it 'with his hand movements' or otherwise," *Taylor*, 16 F.4th at 770, the Court finds that second *Graham* factor weighs in Lopez's favor. *See, e.g.*, *Morris*, 672 F.3d at 1196 (second *Graham* factor weighed heavily in plaintiff's favor where he "carried no weapon, made no overt threats, and did not get within reach of" police); *Hernandez*, 2023 WL 6127879, at *12 (concluding suspect "did not pose an immediate threat to the safety of the officers because" the suspect never advanced toward or pushed officers and kept his hands in the air).

**Resisting or evading arrest.** Considering "whether [Lopez] was actively resisting arrest or fleeing," *Emmett*, 973 F.3d at 1136, the Court finds that this factor weighs only slightly in Park's favor.

There is no dispute that Lopez initially kept walking despite being ordered by FCPS officers to stop. Ex. I at 00:30–00:45; *see also* ECF No. 61 at 4 ¶ 13; ECF No. 65 at 3 ¶ 13. But viewed in the light most favorable to Plaintiff, that fact alone does not necessarily establish that Lopez was attempting to *flee* the scene given that he did not attempt to run or speed away, but kept walking away in the same direction at a normal pace before even being told he was under arrest. Ex. I at 00:30–00:45. *See, e.g.*, *Moquett v. Town of Rock Island*, No. CIV-14-531-RAW, 2015 WL 3952276, at *3 (E.D. Okla. June 29, 2015) ("[A] citizen on foot getting in his car and driving off after an officer has directed him to stay, without more, is not 'evading arrest by flight' or 'actively resisting arrest'" when "plaintiff was not under arrest and had not been threatened with arrest" and officers only asked that he not leave the scene). And after the encounter with Park began, Lopez made no

30

attempt to flee. *Id.* at 00:35–00:30. Nevertheless, given that Lopez initially walked away from the officers after they approached with guns drawn and commanded him to stop, and because Lopez failed to follow Park's verbal commands after being told he was under arrest, the Court finds that the third *Graham* factor weighs very slightly in Defendant Park's favor.

In sum, even though the first and third *Graham* facts weigh in Park's favor to some degree, because the totality of the circumstances—including the second and most important *Graham* factor—weigh heavily in Lopez's favor, the Court concludes that a reasonable jury could find that Lopez has sufficiently established a constitutional violation due to Park's use of excessive force.

b. *Clearly Established*

Next the Court considers whether clearly established law at the time of the incident put Park on notice that his use of pepper spray was objectively unreasonable. Though a somewhat close call, the Court concludes that no clearly established law existed.

In the Tenth Circuit, "the use of mace against an arrestee who 'posed no threat' and 'was no risk of flight'" can "amount[] to excessive force." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (citing *LaLonde v. County of Riverside,* 204 F.3d 947, 961 (9th Cir. 2000)); *see also id.* ("[I]n prior cases, we have assumed that the use of mace and pepper spray could constitute excessive force.") (citing *DeSpain v. Uphoff,* 264 F.3d 965, 978 (10th Cir. 2001)). While Defendants argue that such cases are distinguishable because Lopez was "resisting" arrest in connection with "a high risk stop" while accused of a felony, ECF No. 61 at 14, the Court is not entirely convinced those facts are

sufficiently distinct such that Park was not on notice that it was impermissible to use "disproportionate force to arrest an individual . . . who poses no threat to others." *Perea*, 817 F.3d at 1201, 1204. Indeed, the law does not require that cases be "factually identical" to find clearly established law. *McCoy,* 887 F.3d at 1052. That said, to find that clearly established law existed at the time of the encounter, the Court must determine from the relevant precedent "'whether it would be clear to a reasonable officer that his conduct was unlawful' under the circumstances presented." *Fogarty*, 523 F.3d 1147, 1155 (citing *Saucier v. Katz,* 533 U.S. 194, 202 (2001)). Based on the cases Plaintiffs cite, and its own review, the Court is not so convinced.

For example, to show the law is clearly established, Plaintiffs cite *Wilkins v. City of Tulsa*, 33 F.4th 1265 (10th Cir. 2022), wherein the Tenth Circuit concluded that it was "clearly established that force [used] against a subdued suspect who does not pose a threat violates the Fourth Amendment." *Id.* at 1275–1277. But in *Wilkins*, unlike here, plaintiff was already on the ground with officers sitting on top of him before being pepper sprayed. *Id.* at 1273–1274. Here, though Lopez was not actively resisting, he was certainly not restrained or under police control when Park used the pepper spray.

*Fogarty* is similarly distinguishable because even though Fogarty peacefully resisted officers' commands (as Lopez did here), the Tenth Circuit ultimately concluded that clearly established law demonstrated the unreasonableness of defendants' actions after finding that all of the *Graham* factors weighed in Fogarty's favor. *See Fogarty*, 523 F.3d at 1162 ("Considering that under Fogarty's version of events each of the *Graham* factors lines up in his favor, this case is not so close that our precedents would fail to

portend the constitutional unreasonableness of defendants' alleged actions."). In this case, only the second *Graham* factor (immediacy of threat) weighs firmly in Lopez's favor, while the other two factors weigh at least slightly in favor of Park.

Finally, although *Getzen v. Long* supports Lopez's "'right to be free from the application of non-trivial force for engaging in mere passive resistance,'" No. 21-16437, 2023 WL 118743, at *2 (9th Cir. Jan. 6, 2023) (citing *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013)), Plaintiffs' citation to a single unpublished, out of circuit opinion is insufficient to demonstrate that Defendant Park was on notice that his actions were patently unreasonable. *See Williams v. Hanson*, 5 F.4th 1129, 1132 (10th Cir. 2021) ("A single unpublished opinion does not show clear establishment of the right.").

Due to the absence of clearly established law, the Court concludes Park is entitled to qualified immunity on Lopez's excessive force claim.

## B. Claim I: Excessive Force Against the Individual Officer Defendants

Having addressed the Individual Defendants' request for qualified immunity, the Court now turns to Defendants' assertion that there are no genuine issues of material fact to support Plaintiffs' claims. *See Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1261–62 (10th Cir. 2022) ("If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment— showing 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'") (citation omitted).

Once a plaintiff successfully demonstrates that a defendant violated their clearly established constitutional rights, the burden shifts back to defendants to prove that there

is "no genuine issues of material fact" such that they "[are] entitled to judgment as a matter of law." *Gross v. Pirtle,* 245 F.3d 1151, 1156 (10th Cir. 2001). Defendants fail to meet that burden here as to the remaining excessive force claims against Nace and Bendzsa.

"To succeed under section 1983 on an excessive force theory, [Plaintiffs] must show 'the officers used greater force than would have been reasonably necessary to effect a lawful arrest.'" *Lynch v. Bd. of Cnty. Commissioners of Muskogee Cnty., Oklahoma*, 786 F. App'x 774, 781 (10th Cir. 2019) (citing *Fisher v. City of Las Cruces*, 584 F.3d 888, 893–94 (10th Cir. 2009) (quotations omitted)). "This is an objective inquiry" that requires courts to "consider the totality of the circumstances when making it," *id.* (citing *Cortez v. McCauley*, 478 F.3d 1108, 1125 (10th Cir. 2007) (en banc)). Similar to the qualified immunity analysis, the totality of the circumstances here includes considering "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "Additionally, an officer who observes excessive force may be held liable under section 1983 for failing to intervene so long as there is a realistic opportunity to stop or prevent it." *Lynch*, 786 F. App'x at 781 (citing *Fogarty*, 523 F.3d at 1162, 1164).

1. *Defendant Nace*

Defendants first argue that there is no disputed material fact as to the excessive force claim against Nace. ECF No. 61 at 22–23. In light of its qualified immunity analysis of the *Graham* factors above, the Court disagrees.

34

Indeed, even though San Roman was unarmed and not attempting to flee, Nace still used her Taser on him when less forceful means were available. *See Casey*, 509 F.3d at 1286. As Plaintiffs note, FCPS officers could have simply walked up to San Roman and arrested him while he was standing with his pants around his ankles, with no weapons on his person, and while his hands were open and visibly empty above his head. ECF No. 65 at 5 ¶ 24. Bendzsa, as Nace's superior officer on the scene and the officer who Plaintiffs contend instructed Nace to move forward with the Taser, even admitted as much when he testified that there was a "less forceful option" that could have been used to arrest San Roman in lieu of using the Taser—namely, the "hands-on" approach. *See* ECF No. 65-3 at 46:7–17.

Accordingly, for the same reasons Defendant Nace is not entitled to qualified immunity, the Court concludes that her request for summary judgment must be denied. *See, e.g.*, *Cordero v. Froats*, No. 13-0031 JCH/GBW, 2015 WL 10990332, at *7 (D.N.M. Jan. 9, 2015) (denying summary judgment because "based on [p]laintiff's version of the facts" discussed in connection with the court's qualified immunity analysis, plaintiff "carried his burden" and thus defendants "not shown that they are entitled to summary judgment").

2. *Defendant Bendzsa*

Next, Defendants argue there is no dispute of material fact as to San Roman's excessive force claim against Bendzsa. ECF No. 61 at 24. Specifically, they contend that the claim against Bendzsa should be dismissed because "'[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation,'"

and Bendzsa "was not involved in any use of force with respect to San Roman." ECF No. 61 at 24 (citing *Foote v. Spiegel*, 118 F.3d 1416, 1423-1424 (10th Cir. 1997)). Defendants argue the mere fact that Bendsza directed Nace to "Taser up" is insufficient to show that he was personally involved in Nace's use of force against San Roman. *Id.*

As an initial matter, the Court observes it is undisputed that prior to Nace utilizing her Taser on San Roman, Bendzsa told her to "Taser up." Ex. J at 1:35–1:40; ECF No. 61 at 6 ¶ 22; ECF No. 65 at 5 ¶ 22. However, the parties *do* dispute the meaning of that phrase and whether, by giving Nace this instruction, Bendzsa had directed Nace to *use* the Taser, as opposed to just directing her to take it out of its holster. *See* ECF No. 61 at 34; ECF No. 65 at 24.[17] Viewing the facts in the light most favorable to Plaintiffs, the Court finds that there are disputed issues of material fact as to the meaning of Bendzsa's instructions such that a reasonable jury could find he directed Nace to use the Taser on San Roman.

Review of the BWC footage makes this clear. After telling Nace to "Taser up" twice, Bendzsa directed her to "give [San Roman] a use of force warning," and Nace did. *Id.* at 1:44–1:59. Then, after San Roman still did not comply, Bendzsa instructed Nace and the other officers "to press on," and they did so, moving together toward San Roman who had

---

[17] This argument turns largely on what Bendzsa meant when he instructed Nace regarding the use of her Taser. Though Bendzsa never used the word "deploy," the parties do not dispute that by instructing Nace to "taser up," Bendzsa was telling Nace to "deploy" the Taser. *See* ECF No. 61 at 6 ¶ 22; ECF No. 65 at 5 ¶ 2. However, the parties do dispute what it means to "deploy" a Taser and whether that refers to merely removing the Taser from its holster or actually using it. This presents another disputed issue of material fact that is inappropriate for resolution at summary judgment, particularly since Bendzsa did not actually use the word "deploy" during the encounter. However, the Court does find significant that in his own report following the incident, Bendzsa used the word "deploy" to refer to Nace's *use* of the taser on San Roman, and not merely the act of taking the taser of out its holster. ECF No. 65-3 at 92:6–25.

his shirt off, pants down and hands up. *Id.* at 1:59–2:07. Although Bendzsa did not explicitly instruct Nace to use her Taser when she did, a reasonable juror could find that each of his instructions preceding that event resulted in the end goal that occurred: firing her Taser at San Roman. In fact, according to Defendants' motion, the reason Bendzsa instructed the officers to "press on" was to ensure San Roman was not "beyond Taser range" for Nace. ECF No. 61 at 6 ¶ 23. Viewing the facts in the light most favorable to Plaintiff, the Court concludes that there are disputed material facts that could lead a reasonably juror to find that Bendzsa, as part of a "group effort," "actively participated in a coordinated use of force" on San Roman such that he is liable for any underlying finding of excessive force. *See Est. of Booker*, 745 F.3d at 422.

Because there are disputed material facts surrounding Bendzsa's involvement with Nace prior to her utilizing her Taser, dismissal is inappropriate at this stage.[18]

### C. Claim I: Municipal Liability Against Defendant City of Fort Collins

Next, the Court turns to Plaintiff's claim against the City, which is premised on the allegation that "Fort Collins failed to properly hire, train, supervise, and/or discipline its FCPS employees regarding the proper use of physical restraint and force, resulting in FCPS's excessive use of force against Mr. San Roman and Mr. Lopez." ECF 1 at ¶ 154.

To establish municipal liability under 42 U.S.C. §1983, "a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct and causal link between the custom or policy and the violation alleged." *Jenkins v. Wood*, 81 F.3d 988, 993 (10th Cir.

---

[18] Defendants also argue that to the extent Lopez brings a Fourth Amendment claim against Bendzsa, that claim should be dismissed because Bendzsa's "only involvement with Lopez was directing Officers to apprehend him as he walked away." ECF No. 61 at 24. Plaintiffs do not seem to dispute this in response, and in any event, the Court agrees with Defendants.

1996) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). "It is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. Of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1998). Under these standards, municipal liability may arise only out of official policies, or the actions of a final policymaker, if it can be established that such policies or policymakers were responsible for an underlying constitutional violation. *See id.* at 403-404. Put differently, municipal liability only attaches where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (citation omitted). To the extent Plaintiffs are "attempting to prove a custom or policy by the [City's] failure to act, [they] must plausibly allege there is a pattern of deliberate indifference to situations like" Plaintiffs' here. *Sandberg v. Englewood, Colorado*, 727 F. App'x 950, 963–64 (10th Cir. 2018) (citing *Jenkins*, 81 F.3d at 994).

Defendants advance four arguments to support dismissing Plaintiffs' municipal liability claim and argue that there is no evidence to establish: (1) the existence of a policy, custom or practice, or any deliberate or conscious conduct, of excessive force; (2) insufficient training within FCPS; (3) a failure to supervise or a policy of deliberate indifference; and (4) an underlying constitutional violation. ECF No. 61 at 28–32. Plaintiffs take issue with each proposed basis for dismissal. ECF No. 65 at 29–33. As the Court already determined above, Plaintiffs have established potential constitutional violations

ripe for a jury's consideration, the Court rejects Defendants' fourth argument and considers the remaining arguments below.

    1.  *Custom, Policy, or Practice of Using Excessive Force*

Proving a § 1983 claim against a municipality requires showing "the existence of a municipal policy or custom which directly caused the alleged injury." *Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017) (citing *City of Canton*, 489 U.S. at 385). One way to do so, as Plaintiffs attempt here, is to "offer[] evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (citation omitted). But Defendants argue that Plaintiffs' attempt fails because they offer "no evidence or testimony suggesting any similarity between the use of force [here] and any other previous uses of force." ECF No. 61 at 30. In response, Plaintiffs refer to "*numerous* other, similar instances of the Fort Collins police using excessive force" described in their complaint and argue these cases show "that FCPS officers have a pattern of responding to relatively minor acts of perceived noncompliance with violent force that vastly exceeds any legitimate law enforcement need presented." ECF No. 65 at 30 (citing ECF No. 1 at 12–19). In doing so, the only evidence Plaintiffs cite are the allegations in their complaint describing other instances in which FCPS officers may have used excessive force. *See* ECF No. 65 at 30 (citing ECF No. 1 at 12–19).

As Defendants note, *see* ECF No. 70 at 15, this is insufficient for Plaintiffs to meet their burden. Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment, *see Anderson*, 477 U.S. at 248, and Plaintiffs offer

no actual evidence to support their allegations. Though the complaint refers to other cases and incidents by name, it does not include any case numbers, and Plaintiffs have not included any additional information or evidence that would allow the Court to assess the veracity of those allegations at summary judgment. But even if case numbers were provided, the Court has no duty to search the record for a litigant to find evidence supporting that litigant's interests. *See Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (at summary judgment, "'it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct its own search'").

Accordingly, because Plaintiffs fail to provide evidence to support their assertion that the City has engaged in a pattern, custom, or policy of excessive force, this theory of municipal liability is dismissed.

### 2. *Failure to Train*

Defendants contend that Plaintiffs' failure to train theory must also be dismissed because there is no evidence to show a lack of training or that the City was on notice regarding a constitutional deficiency in its training. ECF No. 61 at 31. In response, Plaintiffs contend that the City's policy or custom of failing to adequately train FCPS officers on the use of force can be inferred from the fact that the City failed to reprimand the Individual Defendants or otherwise address their conduct following their encounter with Plaintiffs. ECF No. 65 at 31–32. As explained below, because a municipality's failure to discipline cannot establish a failure to train theory of municipal liability without, at least,

establishing that the City was aware of a related pattern of behavior, the Court agrees with Defendants.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted). Nevertheless, "a municipality may be liable under § 1983 for failure to train its officers or employees when 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need.'" *Est. of Finn by & through Schwartz v. City & Cnty. of Denver*, No. 21-cv-02160-CNS-SKC, 2023 WL 8355966, at *5 (D. Colo. Dec. 1, 2023) (citing *City of Canton*, 489 U.S. at 390). "[F]ailure-to-train claims come in two general flavors—'pattern' and 'single incident.' In the former, a plaintiff shows deliberate indifference by pointing to 'the existence of a pattern of tortious conduct' by officers." *Id.* (citation omitted). In this case, it is not clear from Plaintiffs' briefing whether they proceed on this theory based on a "pattern" or "single incident" theory, so the Court considers each—both of which fail.

To the extent Plaintiffs contend that their failure to train theory is premised on a pattern, practice, or custom, they offer no evidence of similar incidents to rebut Defendants' argument. But as discussed, reference to conclusory allegations in the complaint describing other incidents wherein FCPS officers allegedly used excessive force is insufficient to defeat Defendants' summary judgment. *See Self*, 439 F.3d at 1230 ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.") (citation omitted); *Est. of Finn*, 2023 WL 8355966, at *5 (no "pattern" to

support a failure to train theory where plaintiff offered "no evidence" of "*any* prior uses of force" in factually similar circumstances) (emphasis in original).

And to extent Plaintiffs intend to establish the City's failure to train based on a "single incident" theory, their claim survives summary judgment "only if there is sufficient evidence for a reasonable jury to find '(1) the existence of a municipal policy or custom involving deficient training; (2) an injury caused by the policy that is obvious and closely related; and (3) that the municipality adopted the policy or custom with deliberate indifference to the injury.'" *Est. of Finn*, N2023 WL 8355966, at *5 (citing *Valdez v. McDonald*, 66 F.4th 796, 816–17 (10th Cir. 2023)). However, Plaintiffs do not specifically address any of these factors in their response. Nor do they argue that in this case, "the need for more or different training is so obvious . . . that the [City's] policymakers . . . can reasonably be said to have been deliberately indifferent to the need.'" *Est. of Finn*, 2023 WL 8355966, at *5 (citing *City of Canton*, 489 U.S. at 390).

Instead, in an attempt to meet their burden, Plaintiffs argue that because Defendants' position is that the Individual Defendants acted in accordance with their FCPS police training, and because no FCPS officers were disciplined by the City (a contention Defendants do not appear to dispute) following their encounter with Plaintiffs, the failure to train theory of municipal liability should survive summary judgment. ECF No. 65 at 31–32. And while the cases Plaintiffs cite establish that a municipality's post-arrest conduct, including a failure to discipline defendants can support finding a material factual dispute sufficient to preclude summary judgment, doing so still requires that plaintiffs identify evidence sufficient to establish "the existence of a general municipal practice . . .

42

when seen in the light most favorable to the plaintiffs." *See, e.g.*, *Cannon v. City & Cnty. of Denver*, 998 F.2d 867, 878 (10th Cir. 1993) (determining that defendants' post-arrest conduct, along with "*all of the plaintiffs' evidence*," was "sufficient, if believed, to support a finding that [defendants] followed a policy or custom resulting in violation of plaintiffs' constitutional rights") (emphasis added).[19] But here, Plaintiffs fail to identify any evidence to show the City was on notice about any specific training deficiencies to establish that it engaged in a pattern, practice, or custom of inadequately training FCPS officers on the proper use of force.[20] *See, e.g.*, *Kulas v. City of Fort Collins*, No. 1:23-cv-02187-CNS-KAS, 2026 WL 160807, at *5 (D. Colo. Jan. 21, 2026) ("Notice of particular deficiencies in a training program is the crux of a failure-to-train theory.") (citing *Est. of Lobato by & through Montoya v. Correct Care Sols., LLC*, No. 15-cv-02718-PAB-STV, 2017 WL 1197295, at *7 (D. Colo. Mar. 31, 2017)). Accordingly, Plaintiff's failure to train theory fails.

---

[19] *See also Ortega v. City & Cnty. of Denver*, 944 F. Supp. 2d 1033, 1038–39 (D. Colo. 2013) (evidence that police officers used force "in accordance with their training" "could permit a reasonable juror to find that [the municipality's] training program failed to appropriately teach its officers how to conduct themselves when stopping an altercation and/or managing a crowd" as part of its analysis of the municipality's deliberate indifference where plaintiffs also provide evidence of "recurring" similar situations that presented "an obvious potential" for a constitutional violation); *Moore v. Miller*, No. 10-cv-00651-JLK, 2014 WL 2207346, at *7 (D. Colo. May 28, 2014) (explaining that in addition to party testimony that "call[ed] into question whether the City failed to train/supervise" officers regarding their use of force, certain post-arrest conduct by the municipality "bolster[ed]" plaintiff's "contention that the [municipality's] training and/or supervision . . . was inadequate").

[20] Plaintiffs also argue that municipal liability can be established based on the City's failure to train officers on the proper definition of the word "deploy." ECF No. 65 at 32. The Court fails to see how this could be. Even if the City's training was deficient in this regard as Plaintiffs contend, the undisputed facts show that Bendzsa never used the word "deploy" while instructing Nace; instead, he told her to "*Taser up*." Ex. J at 1:35–1:40; ECF No. 61 at 6 ¶ 22; ECF No. 65 at 5 ¶ 22. Notwithstanding Bendzsa's testimony that he *meant* "deploy" when he said "Taser up," ECF No. 61 at 6 ¶ 22, without the word "deploy" actually being used, it is unclear how there could be a "direct causal link" between the alleged lack of training and San Roman's injury. *See Schneider*, 717 F.3d at 770 (citing *Brown*, 520 U.S. at 404).

### 3. *Failure to Supervise*

As to the failure to supervise theory, Defendants argue there is no evidence to show that any City policymaker exhibited a conscious disregard of unconstitutional conduct or established a policy reflecting an intentional or deliberate decision. ECF No. 61 at 32. In response, Plaintiffs make no specific argument to refute Defendants' position, choosing instead to address the failure to train and failure to supervise theories together and offering no evidence to dispute Defendants' claim. *See* ECF No. 65 at 31–32. Accordingly, the City is entitled to summary judgment on Plaintiff's failure to supervise theory. *See Anderson*, 477 U.S. at 248 (nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" to defeat a properly supported summary judgment motion).

### D. Claim II: First Amendment Retaliation Claim Against Defendant Park

Last, the Court considers whether Lopez's First Amendment retaliation claim must be dismissed. ECF No. 61 at 25–27. For the reasons explained below, the claim survives.[21]

### 1. *Whether the Undisputed Material Facts Support Lopez's Retaliation Claim*

To establish a First Amendment retaliation claim, Lopez must show that: (1) he engaged in activity the First Amendment protects; (2) Park's actions injured him in a way that would chill a person of ordinary firmness from continuing to engage in that activity and; (3) Lopez's protected activity substantially motivated Park's responsive actions. *See Frey v. Town of Jackson*, 41 F.4th 1223, 1232 (10th Cir. 2022) (citation omitted)

---

[21] Again, the Court notes that Defendants did not argue that Park was entitled to qualified immunity on Claim II. *See* ECF No. 61 at 27–28.

Defendants argue that the undisputed facts do not support the first or third elements. As to the first, they argue that because Lopez was recording Park, he was engaged in conduct not speech and First Amendment protections do not apply. ECF No. 61 at 26. Defendants misunderstand the law. The Tenth Circuit has held that "videorecording is 'unambiguously' speech-creation, not mere conduct." *Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022) (Plaintiff "was engaged in protected First Amendment activity when he filmed the traffic stop.") (citation omitted). However, the right to record police officers performing their duties in public "is subject to reasonable time, place, and manner restrictions." *Id.* at 1292 n.10 (citing *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011). Unlike in *Irizarry*, where the plaintiff recorded officers conducting a traffic stop on another person, *id.* at 1286, here, Lopez himself was the subject of Park's conduct. However, as explained below, because the question of whether officers had probable cause to arrest Plaintiffs in the first instance must be resolved by a jury, viewing the remaining undisputed facts in the light most favorable to Lopez, the Court cannot presently conclude that Lopez was not engaged in a protected First Amendment activity. *Cf., e.g.*, *Novak v. City of Parma, Ohio*, 33 F.4th 296, 304 (6th Cir. 2022) (There is "no recognized right to be free from a retaliatory arrest that is supported by probable cause.") (citing *Reichle v. Howards*, 566 U.S. 658, 663 (2012)).

Defendants' second argument—that there is no evidence to suggest that Lopez's "minimal verbal conduct in any way motivated Officer Park's actions," ECF No. 61 at 26—likewise fails because Plaintiffs identify record evidence that could lead a reasonable juror to conclude that Park pepper sprayed Lopez *because* Lopez was recording their

45

interaction.[22] The BWC footage shows that Park utilized his pepper spray on Lopez just 17 seconds after their interaction began and after Park commanded Lopez to put his phone down multiple times. *See* Ex. L at 00:30–00:47. In fact, Park deployed the pepper spray in Lopez's face immediately after Lopez appears to reference his First Amendment rights and said, "hold on, I have a right to record." *Id.* at 00:42–00:49.

Additionally, Park testified that "one of the reasons" he used pepper spray on Lopez was because Lopez would not put his phone down. *See* ECF No. 65-16 at 80:3–5 ("Q. One of the reasons why you sprayed him is he wouldn't put his phone down, true? A. Correct."). And while Park also testified that he gave this instruction for other reasons, *see, e.g.,* ECF No. 65-16 at 80:3–17;[23] *id.* at 77:24–78:2 (testifying that he instructed Lopez to drop his phone so that Lopez "could get down on the ground"), a reasonable jury could conclude that Lopez's act of recording clearly played some role.[24] Based on the record currently before the Court, it is not clear whether Park was motivated substantially by a desire to prevent Lopez from recording (as is required for liability) or whether his other concerns were the primary drivers. Accordingly, at this stage, the Court cannot determine as a matter of law that Park's decision to pepper spray Lopez was substantially motivated by a desire to prevent Lopez from recording or not and thus,

---

[22] Plaintiffs' response makes clear that "the fundamental basis for Lopez's First Amendment retaliation claim is Park pepper spraying him in the face for filming the police, *not* Lopez's arrest." ECF No. 65 at 29 n. 14.

[23] In addition to pepper spraying Lopez because he would not put his phone down, Park testified that he did so because "[t]his was a weapons call, so the danger to everyone was a little bit higher. [Lopez's] direction took him toward this alley on the right-hand side of the screen, which leads back in the direction of the initial contact. Me [pepper] spraying Lopez was in an effort to take him into custody and not knowing whether or not he's armed or if his phone is being used to call other people or if he's mapping to somewhere else." ECF No. 65-16 at 80:6–17.

[24] There is no indication in the BWC footage that Park commanded Lopez to do anything other than drop his phone. *See* Ex. L at 00:30–00:47.

summary judgment is improper. *See, e.g.*, *Bounds v. San Lorenzo Cmty. Ditch Ass'n*, No. CV 09-580 BB/CG, 2011 WL 13266525, at *1 (D.N.M. Sept. 14, 2011) ("[I]n [a] First Amendment retaliation case, [the] question of whether plaintiff's speech was a substantial motivating factor for adverse treatment . . . 'involves questions of fact that normally should be left for trial.'") (citing *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002)).

### 2.  *Probable Cause*

Defendants also argue that because Park had probable cause to arrest Lopez, his retaliation claim fails. ECF No. 61 at 26–27. The Court disagrees.

Defendants are correct that because the retaliation claim is brought against Park when he was a FCPS police officer, Lopez must establish either that Park "lacked probable cause to arrest [him] or that [Park] historically has not arrested similarly situated people who were not engaged in the same type of speech" for his claim to succeed. *Frey*, 41 F.4th at 1232 (citing *Nieves v. Bartlett*, 587 U.S. 391, 407–08 (2019)); *see also Fenn v. City of Truth or Consequences*, 983 F.3d 1143, 1149 (10th Cir. 2020) ("The presence of probable cause . . . is a bar to a First Amendment retaliation claim."). Finding "[p]robable cause 'requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime.'" *Id.* at 1233 (citing *Cortez*, 478 F.3d at 1116). The existence of "probable cause is 'measured at the moment the arrest occurs.'" *Brown v. Cole*, 568 F. App'x 600, 603 (10th Cir. 2014) (citing *Cortez,* 478 F.3d at 1121).

While Defendants proclaim that probable cause existed at the time of the arrests, they do so without identifying any specific facts to support their position or analogizing the situation here to existing case law. Given this lack of guidance, the Court reviews and assesses the relevant undisputed facts known to FCPS officers leading up to Plaintiffs' arrests to consider whether probable cause existed.

The undisputed facts show that on the night of Plaintiffs' arrest, FCPS officers were informed about a theft of firearms from a vehicle near downtown Fort Collins and received reports of a suspicious SUV in the same area. *See* ECF No. 61 at 2 ¶¶ 1, 2, 4; ECF No. 65 at 1 ¶¶ 1, 2, 4. Around the same time, a 911 caller reported that they heard the sound of a shotgun "being pumped" or "racked" in downtown Fort Collins and observed a "suspicious circumstance" close to where the theft was reported. *Id.* at 3 ¶ 5; ECF No. 65 at 2 ¶ 5. This information was relayed to Bendzsa, who "believed the two incidents were related." *Id.* at 3 ¶ 7; ECF No. 65 at 2 ¶ 7. Bendzsa also personally "heard the sound of someone "racking" a pump action shotgun" and observed Plaintiffs "standing near a sport utility vehicle . . . two blocks from where the weapons were reported stolen." *Id.*

Other than the above, the Court sees no other undisputed facts that the officers would have considered prior to approaching Plaintiffs to make an arrest. Defendants make no suggestion that any description of the suspects was offered or matched Plaintiffs. *Cf. United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010) (probable cause to arrest existed where defendant "matched [the] description" of a suspect in a shooting who fled the scene). Nor do the undisputed facts establish that Lopez was carrying a weapon. *See, e.g.*, *United States v. Davis,* 94 F.3d 1465, 1470 (10th Cir. 1996)

48

(no reasonable suspicion where defendant made no threats and did not appear to be hiding anything even though "officers told him to stop and to take his hands out of his pockets" and defendant "continued walking in the same direction and manner" away from officers without reacting).

Additionally, while certain facts—including that a 911 caller reported suspicious activity regarding a Ford SUV while Plaintiffs were driving a Ford SUV that evening—could support a finding of probable cause or reasonable suspicion, *see, e.g.*, *United States v. Young*, 986 F.2d 1431, 1992 WL 401580, at *1 (10th Cir. 1992) (table) ("General descriptions, either of a getaway car or of suspects, may support probable cause for warrantless arrests, and may also give rise to reasonable suspicion for *Terry* stops.") (citing *United States v. Miller,* 532 F.2d 1335, 1337 (10th Cir.), *cert. denied,* 429 U.S. 839 (1976)), other factual disputes remain that bear on the reasonableness of relying on such information without more.

For instance, it is not clear whether the suspicious vehicle reported actually matched Plaintiffs' vehicle that evening because the FCPS report on Plaintiffs' arrests states that after Bendzsa "arrived on scene and could hear the racking of a shotgun coming from a *White* Ford Vehicle with a trailer attached." ECF No. 61-1 at 2 (emphasis added). But as Plaintiffs note, they were driving a *black* Ford Explorer that evening. ECF No. 65 at 2 ¶ 4 (citing ECF No. 65-1 at 1:30); *see also* Ex. I at 1:08–1:28. While Defendants contend that Bendzsa "observed San Roman and Lopez standing at the open rear hatch of their vehicle manipulating what appeared to be 'long guns,'" ECF No. 61 at 4 ¶ 8 (citing ECF No. 61-5 at 81:24–25; 82:1–14; 86:22–23), Plaintiffs note this fact was

49

omitted from Bendzsa's post-arrest report, which could lead a jury to reasonably conclude that his testimony was false, ECF No. 65 at 2 ¶ 8 (citing ECF No. 62-2). Because the Court cannot resolve questions about disputed material facts at this stage, "it is a jury question . . . whether an officer had probable cause to arrest." *Cortez*, 478 F.3d at 1120 (citing *DeLoach v. Bevers,* 922 F.2d 618, 623 (10th Cir. 1990)).

Thus, viewing the facts in the light most favorable to Plaintiff, summary judgment as to the retaliation claim against Park is denied.[25]

## IV.    CONCLUSION

Consistent with the foregoing, the Court hereby ORDERS that Defendants' Motion for Summary Judgment on all Claims Pursuant to Fed. R. Civ. P. 56 and Individual Defendants' Request for Qualified Immunity, ECF No. 61, is GRANTED IN PART as to Claim I against Defendant Park, who is entitled to qualified immunity on that claim, and against Defendant City of Fort Collins, and DENIED IN PART as to the excessive force claims against Defendants Nace and Bendzsa and as to the First Amendment Retaliation claim against Defendant Park.

---

[25] Based on Defendants' briefing, as well as the officers' conduct when they first approached Plaintiffs, a reasonable jury could conclude that FCPS officers attempted to arrest Plaintiffs as soon as the encounter began. In the motion, Defendants contend that Lopez was already "under arrest" at the time Defendant Park commanded Lopez to put down his phone. ECF No. 61 at 26. The BWC footage also shows that ordering Lopez to put his phone down was the first command Park gave. *See* Ex. L at 00:30–00:47. Unlike in a *Terry* stop, no officers here stopped Plaintiffs to ask questions. Multiple officers approached Plaintiffs and began yelling orders at Plaintiffs that the officers clearly felt had to be addressed. *See United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) ("Officers may ask the detained individual questions during the *Terry* stop in order to dispel or confirm their suspicions, [b]ut the detainee is not obliged to respond. . . . An encounter . . . which goes beyond the limits of a *Terry* stop, however, may be constitutionally justified only by probable cause or consent." (cleaned up and citations omitted)). Moreover, a reasonable jury could conclude that Plaintiffs were clearly not free to leave given that the officers kept their weapons drawn and pointed at Plaintiffs throughout the stop. For these reasons, the Court concludes that Plaintiffs' arrest began the moment the officers encountered them, which is the same point at which probable cause must be assessed. *See, e.g., Calhoun v. Buck*, 371 F. Supp. 3d 1008, 1014 (D. Utah 2019) ("Probable cause is assessed using an objective standard and determined at the time of the arrest.") (citations omitted).

DATED on this 6th day of August 2026.

BY THE COURT:

_____

Charlotte N. Sweeney
United States District Judge